UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DANIEL V. CRAIG,<br><br>        Plaintiff,<br><br>    v.<br><br>SILVER SAGE RANCH, LLC; RENEE E.<br>BAKER f/k/a RENEE BUERMANN;<br>JOSEPH R. BUERMANN; BURMA<br>NAYLOR; and SILVERCREEK REALTY<br>GROUP,<br><br>        Defendants. | Case No. 1:22-cv-00115-AKB<br><br>**MEMORANDUM DECISION<br>AND ORDER RE MOTION FOR<br>SUMMARY JUDGMENT** |

Pending before the Court is the Motion for Summary Judgment of Defendants Silver Sage Ranch, LLC; Renee E. Baker; and Joseph R. Buermann. (Dkt. 60). The Court heard oral argument on July 17, 2024. For the reasons discussed, the Court grants in part and denies in part Defendants' motion for summary judgment.

## I.  BACKGROUND

In 2018, Plaintiff Daniel Craig decided to sell his family farm in Wisconsin and purchase a cattle ranch out west. To help in his search for an Idaho ranch to purchase, Craig retained Krista Deacon, the designated broker for Defendant Silvercreek Realty Group, LLC ("Silvercreek Realty"), an Idaho brokerage company. (Dkt. 54 at pp. 50-52). Defendant Burma Naylor is an Idaho real estate agent, who was affiliated with Silvercreek Realty. In March 2019, Naylor learned of the Midvale Ranch, near Midvale, Idaho, and notified Craig. Defendant Silver Sage Ranch, LLC ("Silver Sage Ranch") owned the Midvale Ranch, and that entity's two members are Defendants

Renee Baker and Joseph Buermann (jointly referred to as "the Buermanns"). After visiting the ranch in April 2019, Craig decided to make the Buermanns an offer.

In May 2019, the parties entered into a real estate purchase and sale agreement ("Purchase Agreement") for the Midvale Ranch property located at 1649 North Crane Road.[1] (*Id.* at pp. 32-40). The parties agreed Craig would purchase the Midvale Ranch for $3.3 million, and he pledged $115,000 in earnest money. (*Id.* at p. 32). The closing date was originally set for July 8, 2019. Given Craig's intent to purchase the Midvale Ranch, the Buermanns began looking for a new residence and located a property in Sweet, Idaho. The Buermanns entered into a purchase and sale agreement for the Sweet property and coordinated the closing date for that purchase with the closing date for the Midvale Ranch.

Craig struggled to finance his purchase of the Midvale Ranch, however. On May 31, 2019, Craig and the Buermanns agreed to extend the closing date for the Midvale Ranch to August 12. As part of this agreement, $25,000 of Craig's earnest money was released to the Buermanns as nonrefundable. (*Id.* at p. 42). The Buermanns accordingly extended the closing date for the Sweet property and increased their earnest money on that property.

In early August 2019, Craig again sought to extend the closing date for the Midvale Ranch. To obtain an extension, Craig agreed to contribute additional earnest money for the Midvale Ranch and agreed to release that money to the Buermanns to finance their purchase of the Sweet property. Memorializing this agreement, the parties entered into Addendum No. 4 to the Purchase

---

[1]     The Midvale Ranch is comprised of two parcels, including North Crane Road property and the surrounding property. The parties entered into a separate real estate purchase and sale agreement for the surrounding property. That purchase agreement is not at issue in this case. For purposes of this decision, the Court refers to the property located at 1649 North Crane Road, which is the subject of the Purchase Agreement at issue, as the Midvale Ranch.

Agreement, which extended the closing date for the Midvale Ranch to October 31 and increased Craig's earnest money by an additional $682,000. (*Id.* at p. 48). Importantly for purposes of this action, Addendum No. 4 designated the $682,000 as "non-refundable" but provided the funds would be credited to Craig's purchase of the Midvale Ranch at closing. (*Id.*).

Thereafter, the funds were released to the Buermanns, who used the $682,000 to purchase the Sweet property. By October 31, 2019, however, Craig remained unable to finance his purchase of the Midvale Ranch. Ultimately, the Purchase Agreement for the property expired on October 31, and Craig began attempting to recover his $682,000 in earnest money from the Buermanns. In November 2019, the parties discussed the Buermanns returning the earnest money less any costs attributable to Craig's failure to close on the Midvale Ranch. (Dkt. 69-1 at ¶¶ 33-37). Craig testified that he had a phone call with Baker in early November and that she stated "they would return the money when the [Midvale Ranch] sold." (Dkt. 60-4 at p. 256, ll. 20-23).

According to Craig:

> [The Buermanns] agreed in a telephone call that they would return my earnest money after they had sold the ranch and accounted for any costs they had incurred due to my inability to close. They said they could not repay me until the ranch sold because they had used the earnest money to buy the Sweet Property. Consistent with our good faith attempts to work together to that point, I chose to hold off pursuing a return of the money to give them time to sell the Midvale Ranch.
> I was assured in communications with [Baker] over the course of the two years following that first discussion in November 2019 that [the Buermanns] would make me whole by returning my earnest money when [the] Midvale Ranch sold. I held off on suing [the Buermanns] over their refusal to repay my earnest money because of their agreement, until it became clear they did not actually intend to repay the $712,000 that funded their purchase of the Sweet Property.

(Dkt. 69-2 at ¶¶ 7, 8; *see also* Dkt. 69-1 at ¶ 35) (citing deposition testimony).

Regarding repaying Craig's earnest money, Baker testified she and Buermann "kept open communication with [Craig] about the possibilities of refunding a portion of the money. But it was

always based on what it cost us."[2] (Dkt. 60-7 at Tr. p. 57, ll. 18-21; *id.* at Tr. p. 58, ll. 1-3) (testifying Baker had five or six conversations with Craig about "the possibilities of refunding a portion of the money"). Further, Baker testified that the Midvale Ranch had to sell and that any expenses had to be accounted for before any money could be returned to Craig. (*See, e.g.*, Dkt. 60-7 at Tr. p. 63, ll. 3-7 ("Q. . . . '[W]hen you would convey this, "We're willing to give some money back but it's dependent on costs,' is that how you articulated it or stated it to [Craig]?' A. Yes."); *id.* at Tr. p. 65, ll. 1-8 ("Q. So once you'd accounted for what you believe are your losses as a result of the deal that didn't go forward and after the [Midvale Ranch] sold, you would sit down with [Craig] and try to return the earnest money, correct? Whatever portion was appropriate based on your losses, correct? A. Yes."); *id.* at Tr. p. 306, ll. 24-25, Tr. p. 307, ll. 1-8 ("Q. But you agreed that you would do that cost analysis and that you would present to [Craig] that cost analysis and come to an agreement to return the balance of the earnest money that wasn't part of that, correct? . . . . A. Yes.")).

Although the Buermanns did not sell the Midvale Ranch until May 2021 (*id.* at Tr. p. 266, ll. 9-11), they did return some of Craig's earnest money to him in October 2020. Around that time, Silvercreek Realty discovered during a "file review" of Craig's potential purchase of the Midvale Ranch that the title company still held $90,000 of Craig's earnest money in trust. The Buermanns authorized the return of that earnest money to Craig, despite that Addendum No. 4 designated the earnest money as nonrefundable.

---

[2]     Buermann testified that Craig and Baker had several discussions but that Buermann either did not participate in the discussions or could not recall the substance of the discussions. (Dkt. 60-5 at pp. 53-54). Buermann did testify, however, that he did not disagree with Baker's testimony. (Dkt. 60-5 at p. 7).

In May 2021, the Buermanns sold the Midvale Ranch to a third party for $5.1 million. (Dkt. 69-1 at ¶ 44). Thereafter, Craig continued to contact the Buermanns about the return of his earnest money. Baker testified, however, that she quit communicating with Craig in early 2022 after she received a letter from his counsel about the issue and after she received legal advice that the earnest money did not have to be returned. (Dkt. 60-7 at Tr. p. 220, ll. 3-14). Despite their eventual sale of the Midvale Ranch, the Buermanns never returned any additional earnest money to Craig.

In March 2022, Craig sued Silver Sage Ranch and the Buermanns, seeking recovery of the balance of his earnest money. Subsequently, Craig moved to amend his complaint to add Naylor and Silvercreek Realty as defendants. After that motion was granted, Craig filed an amended complaint adding the new defendants[3] and asserting seven claims against Silver Sage Ranch and the Buermanns, including: (1) breach of the Purchase Agreement,[4] (2) rescission of the Purchase Agreement due to mutual mistake, (3) breach of the amended Purchase Agreement or an oral contract for return of earnest money, (4) unjust enrichment, (5) declaratory judgment, (6) fraud in the inducement, and (7) violation of Idaho Consumer Protection Act ("ICPA"), Idaho Code §§ 48-601 – 48-619. (Dkt. 54 at ¶¶ 45-87). Defendants move for summary judgment on all of Craig's claims against them.

---

[3]     The new defendants, Naylor and Silvercreek Realty, have moved to dismiss Craig's amended complaint as against them (Dkt. 62), and the Court addresses that motion in a separate order.

[4]     Craig does not oppose Defendants' summary judgment motion on his claim that Defendants breached the Purchase Agreement. (Dkt. 69 at p. 15 n.9). Accordingly, the Court grants Defendants' motion on the claim without analysis.

## II.  LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986). The trial court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). In considering a motion for summary judgment, the court must "view[] the facts in the non-moving party's favor." *Id.* To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in the respondent's favor." *Id.* (citation omitted).

The trial court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather, the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that precludes summary judgment. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

## III.  ANALYSIS

### A.      Breach of Oral Contract for Return of Earnest Money

Craig claims Defendants breached an oral contract to return his earnest money.[5] According to Craig, Defendants orally agreed that, once they sold the Midvale Ranch, they would return Craig's earnest money, less any costs they incurred due to his inability to close on his purchase of the Midvale Ranch. (Dkt. 69 at p. 11-12). In exchange, Craig contends he agreed not to pursue any legal action against Defendants. Defendants challenge Craig's assertion that the parties entered into an oral contract on several grounds. First, misunderstanding Craig's articulation of the oral contract, Defendants argue the statute of frauds bars any oral contract regarding the sale of real property. (Dkt. 60-1 at p. 19). *See* I.C. § 9-505. Craig responds, however, that the parties' oral contract is unrelated to the conveyance of real property. (Dkt. 69 at p. 11). The Court agrees that, as alleged, the oral contract is for the return of the earnest money, does not involve real property, and is capable of being performed within one year. *See* I.C. § 9-505(1), (4). Accordingly, the Court concludes the statute of frauds is inapplicable.

Second, Defendants argue any oral contract fails for lack of consideration. (Dkt. 60-1 at p. 22). "To be enforceable at law, an agreement must be supported by valid consideration." *Weisel v. Beaver Springs Owners Ass'n, Inc.*, 272 P.3d 491, 498 (Idaho 2012). Consideration exists where

---

[5]      Craig's amended complaint alleges a claim for "breach of amended purchase agreement/oral contract for return of earnest money." (Dkt. 54 at p. 19). In moving for summary judgment, Defendants argue that the parties could not orally modify the Purchase Agreement. In response, Craig concedes the parties did not orally modify the Purchase Agreement. (Dkt. 69 at p. 19 n.12; *see* Dkt. 54 at ¶¶ 58-60 (alleging that the parties orally modified the purchase agreement and that "[t]he oral agreement is simply for the return of the earnest money and does not involve the conveyance of real estate between the parties")). Accordingly, the Court's analysis focuses on Craig's claim that the parties orally agreed to return some of Craig's earnest money after the Buermanns sold the Midvale Ranch.

the performance or a return promise is bargained for—meaning that the performance or return promise is both sought in exchange for a promise or the performance and given in exchange for that promise or performance. *Papin v. Papin*, 454 P.3d 1092, 1106 (Idaho 2019). The party asserting the lack of consideration bears the burden of proving that fact by a preponderance of the evidence. *Weisel*, 272 P.3d at 498.

In response to Defendants' argument that the alleged oral contract lacks consideration, Craig argues his "forbearance from filing suit against [Defendants] constitutes ample consideration."[6] (Dkt. 69 at p. 19). Under Idaho law, forbearance of a party's right against another may constitute valid consideration. *McColm-Traska v. Valley View, Inc.*, 65 P.3d 519, 523 (Idaho 2003). More specifically, Idaho courts recognize "[f]orbearance from exercising a right—such as the right to resort to the courts to settle a dispute—in exchange for a promise to pay money constitutes consideration." *Id.* at 524. In support of his forbearance argument, Craig points to his testimony about choosing not to pursue litigation for years and Baker's testimony acknowledging Craig did not file suit for quite some time. (Dkt. 60-4 at p. 79; Dkt. 60-7 at p. 69). Baker also acknowledges she quit communicating with Craig about returning the earnest money after she received a letter from Craig's counsel about the issue in early 2022 and before Craig filed his original complaint in March 2022. (Dkt. 60-7 at p. 17; Dkt. 1). Viewing these facts in favor of the nonmoving party, a jury may reasonably find Craig forbore suing Defendants in exchange for their

---

[6]    Moreover, Craig highlights Defendants "have amassed a small real estate empire spanning multiple states" through their use of the earnest money. (Dkt. 69 at p. 14). Craig has separately noted the earnest money functioned as an interest-free loan to Defendants and enabled Defendants to purchase the Sweet property without obtaining conventional financing. (*See* Dkt. 69-3 at p. 136). Based on these facts, a jury could reasonably conclude Defendants received the time value of the earnest money because of Craig's forbearance.

promise to return the earnest money, and Craig has raised material factual issues regarding this exchange.[7] *See McColm-Traska*, 65 P.3d at 524.

Third, Defendants argue the alleged oral contract lacks specificity and definiteness because the amount of money and the time for return of the money are "undefined." (Dkt. 74 at pp. 7-8). To be enforceable, a contract must be sufficiently definite and certain in its terms and requirements. *Fischer v. Croston*, 413 P.3d 731, 739 (Idaho 2018). No enforceable contract arises where the parties leave a material term open to future negotiation. *Syringa Networks, LLC v. Idaho Dep't of Admin.*, 305 P.3d 499, 507 (Idaho 2013). Further, the parties' agreement to eventually reach an agreement does not give rise to an enforceable contract. *Id.*; *accord Treasure Valley Home Sols., LLC v. Chason*, 524 P.3d 1272, 1276 (Idaho 2023). Nevertheless, a contract is sufficiently definite and certain where it contains provisions capable of being reduced to certainty. *Hoffman v. Bd. of the Loc. Improvement Dist. No. 1101*, 415 P.3d 332, 337 (Idaho 2017); *Giacobbi Square v. PEK Corp.*, 670 P.2d 51, 53 (Idaho 1983).

In response to Defendants' argument that the alleged oral contract lacks specificity, Craig argues Defendants agreed to return the earnest money, less any expenses incurred, after the Midvale Ranch sold. Craig points to evidence supporting these terms. For example, Craig and

---

[7]     Defendants emphasize that Craig testified "there were *no* other terms to this alleged agreement" beyond Defendants repayment of the money. (Dkt. 60-1 at p. 23). Defendants appear to argue Craig's testimony waives, or at least discredits, his forbearance argument. Idaho case law, however, recognizes that the parties may have an implied understanding of the contract's terms and that implied understanding can include forbearance of suit. *McColm-Traska v. Valley View, Inc.*, 65 P.3d 519, 524 (Idaho 2003). That Craig did not specifically testify he forbore his right to sue pending repayment does not foreclose the reasonable inference that the parties implicitly understood Craig's promise of forbearance of suit was being given in exchange for Defendants' promise of repayment.

Baker both testified to their understanding that any money would be returned less expenses after the Midvale Ranch sold. (Dkt. 60-4 at pp. 66, 79; Dkt. 60-7 at pp. 18, 57, 65, 69, 78-80). *See Giacobbi Square*, 670 P.2d at 53 ("Although the exact amount . . . is left to future determination, a formula for the computation of that amount is provided in the contract."). Further, it is undisputed the Buermanns returned $90,000 of Craig's nonrefundable earnest money in October 2020 after Silvercreek Realty discovered the title company still held that earnest money in trust. Craig asserts this conduct is evidence of the parties' oral contract to return his earnest money. (Dkt. 69 at p. 18). Viewing these facts in Craig's favor, a jury could reasonably conclude the parties agreed Defendants would return the earnest money less any expenses once the Midvale Ranch sold. Accordingly, the Court denies summary judgment to Defendants on Craig's breach of oral contract claim.[8]

**B.     Rescission of Purchase Agreement due to Mutual Mistake**

Craig also seeks rescission of the Purchase Agreement and its amendments based on the parties' alleged mutual mistake. Craig alleges "the parties mistakenly believed that Craig would secure the necessary financing" to purchase the Midvale Ranch. (Dkt. 69 at p. 15). Defendants challenge this claim, arguing the parties were not mutually mistaken as to Craig's ability to obtain

---

[8]     Craig also seeks summary judgment on this claim pursuant to Rule 56(f) of the Federal Rules of Civil Procedure. (Dkt. 69 at p. 17, n.11). Craig suggests the Buermanns discarded evidence relevant to Defendants' expenses and argues Defendants are unable to calculate expenses as a result. (*Id.*). The record is unclear regarding whether all evidence of expenses has been discarded, however. Accordingly, the Court declines to grant Craig summary judgment pursuant to Rule 56(f).

financing, and even if Craig was mistaken as to his ability, his unilateral mistake does not justify rescission.[9] (Dkt. 60-1 at pp. 18-20).

"Rescission is an equitable remedy which ideally [returns] the parties to their pre-contract status quo." *O'Connor v. Harger Const., Inc.*, 188 P.3d 846, 851 (Idaho 2008); *see also Bolognese v. Forte*, 292 P.3d 248, 253 (Idaho 2012) (noting claim of mutual mistake invokes court's equitable jurisdiction and therefore is not resolved by jury). If granted, rescission "restores parties to their original position, as if the contract had never occurred." *O'Connor*, 188 P.3d at 851. Rescission is proper where both parties, at the time of contracting, are mutually mistaken about a material fact. *Id.*; *Tricore Invs., LLC v. Est. of Warren*, 485 P.3d 92, 111 (Idaho 2021). The party seeking rescission bears the burden of proving a mutual mistake by clear and convincing evidence. *O'Connor*, 188 P.3d at 851.

"A mistake is an unintentional act or omission arising from ignorance, surprise, or misplaced confidence." *Bailey v. Ewing*, 671 P.2d 1099, 1102 (Idaho Ct. App. 1983). To establish a mutual mistake, the mistake must be common to both parties. *Tricore Invs.*, 485 P.3d at 111. A unilateral mistake is not normally grounds for relief. *Bailey*, 671 P.2d at 1102. "A mutual mistake occurs when both parties, at the time of contracting, share a misconception regarding a basic assumption or vital fact upon which they based their bargain." *Id.* (quotation marks omitted). To

---

[9]     Craig also alleged in his amended complaint that the parties were mutually mistaken that Defendants would sell the Midvale Ranch to anyone other than Craig. (Dkt. 54 at ¶ 54). To the extent Defendants focus on this allegation in support of their summary judgment motion, Craig asserts they "mischaracterize" his rescission claim "by limiting it to a mistake regarding the sale of the Midvale Ranch to a third party." (Dkt. 69 at p. 15). In contrast to Defendants' argument, Craig focuses on the parties' alleged mutual mistake about his ability to obtain financing to close the transaction.

justify rescission, the mutual mistake must be so substantial and fundamental as to defeat the objective of the parties' contract. *Id.*; *Tricore Invs.*, 485 P.3d at 111.

Craig argues that he and Defendants "all believed [he] would obtain the financing he needed to close on the purchase of the Midvale Ranch" and that this ultimately mistaken belief justifies rescission. (Dkt. 69 at p. 15). In support, Craig cites (1) the Buermanns' testimony that, when they executed Addendum No. 4, they believed the sale would close given how much nonrefundable earnest money Craig committed, and (2) his testimony that he expected to obtain financing and close on the ranch. (*See, e.g.*, Dkt. 60-4 at p. 61; Dkt. 60-5 at pp. 37, 63; Dkt. 60-7 at pp. 15, 40, 49). Further, Craig asserts "the parties failed to account for how the earnest money would be handled if there was no closing." (Dkt. 69 at p. 16). In support of his assertion the parties' alleged mutual mistake justifies rescission, Craig relies on *O'Connor*, 188 P.3d at 851. (Dkt. 69 at p. 16).

In that case, O'Connor and Harger contracted for Harger to construct a home for O'Connor on a lot that Harger owned. *Id.* at 849. The lot was bordered both by a public street and by a private driveway on a neighboring property. *Id.* at 850. "[T]he cost to build the driveway from the public street would increase the cost of the home by more than $100,000." *Id.* at 853. To avoid this cost, O'Connor "informed Harger that she would be able to acquire an easement on the private driveway" based on O'Connor's "social relationship" with the neighbor. *Id.* at 850-51. Both parties believed O'Connor would be able to obtain an easement from the neighbor, and "the price of the home was conditioned on access through use of the easement on the private driveway." *Id.* at 851. Based on this less expensive access, the parties' contract provided for a final home price of $585,000 and required O'Connor to pay a "non-refundable deposit" of $40,000. *Id.* at 849.

Ultimately, however, the neighbors "were unwilling to grant an easement on the private driveway." *Id.* at 850. After construction was delayed "because of the problems with the easement on the private driveway," Harger offered to sell the lot to O'Connor, or alternatively, "to rescind the contract and return her full deposit." *Id.* In response, O'Connor sued Harger, asserting breach of contract and requesting damages, or alternatively, specific performance. *Id.* at 849. Harger asserted an affirmative defense of mutual mistake. *Id.* at 852 (ruling Harger had burden of proving affirmative defense of mutual mistake). The trial court found a mutual mistake, rescinded the contract, and ordered Harger to repay O'Connor's deposit to return the parties to their status quo. *Id.* at 849. On appeal, the Idaho Supreme Court affirmed the rescission, concluding the trial court did not error by finding that "both parties mistakenly believed the easement existed or would be granted" and that "the mistake was fundamental to the contract." *Id.* at 851.

*O'Connor* is distinguishable from this case in one very important respect. In *O'Connor*, the parties' mistaken basic assumption was about a particular aspect of the subject matter of the contract that was vital to the purchase price, i.e., that there was access to the property via the private driveway. The Court described the mutual mistake as "both parties [holding] the mistaken belief that access to the property could be granted by way of an easement on the private driveway" and as "the parties mistakenly [believing] the easement existed or would be granted." *Id.* That O'Connor asserted she could obtain the access through her social relationship with the neighbor, however, was not a fact the Court identified as the mutual mistake. In other words, the parties' mistaken belief was not that O'Connor would perform as promised by convincing the neighbor to grant an easement. O'Connor's performance was not the "basic assumption" or "vital fact" about which the parties were mistaken. *Bailey*, 671 P.2d at 1102 (noting mutual mistake when parties

share misconception about basic assumption or vital fact). Rather, the parties' mutual mistake was about private access to the property.

By contrast, here the mistake does not relate to the subject matter of the contract—the Midvale Ranch. Rather, the alleged mistake relates to Craig's ability to perform his obligation under the Purchase Agreement. Namely, the mistake focuses not on a basic assumption about the Midvale Ranch but on a basic assumption about Craig—whether he would be able to obtain financing and, in turn, to perform his contractual obligations. Craig has not cited any authority, and this Court is unable to locate any, that supports the proposition the mutual mistake doctrine applies when the parties mistakenly believe one party to the contract will perform his obligations under the contract but then is unable to perform. For this reason, the Court concludes the mutual mistake doctrine is inapplicable to rescind the Purchase Agreement based on a mistaken belief about Craig's ability to obtain financing and perform the contract and grants Defendants' summary judgment motion on this claim. *Cf.* RESTATEMENT (SECOND) OF CONTRACTS, § 152(1) (noting contract is voidable for mutual mistake unless adversely affected party bears risk of mistake); *id.* at § 154 (discussing when party bears risk of mistake).

## C.      Unjust Enrichment

Defendants also seek summary judgment on Craig's unjust enrichment claim. (Dkt. 54 at ¶¶ 64-67). Unjust enrichment, however, is not a claim but rather "the measure of recovery under a contract implied in law." *Barry v. Pac. W. Const. Inc.*, 103 P.3d at 440, 447 (Idaho 2004). "A contract implied in law, or quasi-contract, is not a contract at all, but an obligation imposed by law for the purpose of bringing about justice and equity without reference to the intent of the agreement of the parties, and, in some cases, in spite of an agreement between the parties." *Id.* Unjust enrichment exists when: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant

appreciated the benefit; and (3) the defendant's acceptance of the benefit, without paying the plaintiff for its value, is inequitable under the circumstances. *Vanderford Co. v. Knudson*, 165 P.3d 261, 272 (Idaho 2007). A claim for unjust enrichment is impermissible, however, where an enforceable contract between the parties covers the same subject matter. *Id.*; *Thomas v. Thomas*, 249 P.3d 829, 836 (Idaho 2011).

In his amended complaint, Craig alleges Defendants were unjustly enriched when he paid them the nonrefundable earnest money under Addendum 4 and they retained that benefit without repaying him. (Dkt. 54 at ¶¶ 64-67). Challenging this claim, Defendants argue Craig's reliance on unjust enrichment is foreclosed because an enforceable contract—the Purchase Agreement and its addenda—exists. (Dkt. 60-1 at pp. 24-25). In response, Craig seeks to alter his reliance on the unjust enrichment doctrine, asserting he relies on the doctrine as an alternative to his breach of oral contract claim. (Dkt. 69 at pp. 26-27). Asserting he has met the elements for unjust enrichment, Craig argues he "forbore bringing this lawsuit for years, which conferred a substantial benefit upon [Defendants]"; Defendants appreciated this benefit because they were able to use the earnest money "to amass a significant amount of wealth"; and for Defendants to retain this benefit without repaying him would be unjust. (Dkt. 69 at pp. 26-27).

Craig acknowledges his unjust enrichment argument in opposition to Defendants' summary judgment motion goes beyond the scope of his unjust enrichment allegations in his amended complaint, and he requests the Court to allow him to "conform the allegations to the proof regarding the benefit conferred" to Defendants. (Dkt. 69 at p. 26). Regardless, even if Craig had alleged his temporary forbearance in bringing this action against Defendants conferred a benefit on them, that benefit is not the type which the unjust enrichment doctrine contemplates. Craig cites no authority for the proposition that temporarily delaying a lawsuit is a benefit giving

rise to a recovery for unjust enrichment. Moreover, a conclusion that such a delay confers a benefit warranting an award for unjust enrichment would arise every time a plaintiff appreciably delayed filing a lawsuit for whatever reason or purpose. Absent authority, the Court declines to construe the unjust enrichment doctrine so broadly.

**D.      Fraud in the Inducement**

Craig alleges in his amended complaint that the Buermanns fraudulently induced him to pay $682,000 in nonrefundable earnest money by representing that they would return the money if the Midvale Ranch sale did not close and that the earnest money was designated nonrefundable only to allow them to use the funds to close on the Sweet property. (Dkt. 54 at ¶¶ 74-77). Defendants dispute this claim and cite Craig's deposition in which he testifies he never discussed what happens to the earnest money if he did not purchase the Midvale Ranch. (Dkt. 60-1 at p. 23; *see, e.g.*, Dkt. 60-4 at p. 301, ll. 24-25). Based on this and other similar testimony, Defendants argue Craig has failed to establish the essential elements of his fraud claim. In reply, Craig now asserts fraud by omission, arguing "at no time did the Buermanns tell [him] they intended to keep his earnest money even if he did not close on the property." (Dkt. 69 at p. 25). He contends that "if he'd known the Buermanns viewed [the earnest money] as nonrefundable," he "would not have put up so much 'earnest money.'" (*Id.*).

A contract procured "through the use of fraudulent representations is voidable." *Budget Truck Sales, LLC v. Tilley*, 419 P.3d 1139, 1144 (Idaho 2018). Although the terms of a written contract usually control, fraud in the inducement "can provide a basis for demonstrating that the parties agreed to something apart from or in addition to the written documents." *Aspiazu v. Mortimer*, 82 P.3d 830, 833 (Idaho 2003). "Idaho law firmly allows that '[f]raud in the inducement is always admissible to show that representations by one party were a material part of the bargain.'"

*Id.* (quoting *Thomas v. Campbell*, 690 P.2d 333, 337 (Idaho 1984)). To establish fraud, a plaintiff must prove nine elements by clear and convincing evidence:

> (1) a statement of fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) the speaker's intent to induce reliance; (6) the hearer's ignorance of the falsity of the statement; (7) reliance by the hearer; (8) the hearer's right to rely; and (9) consequent and proximate injury.

*Country Cove Dev., Inc. v. May*, 150 P.3d 288, 293 (Idaho 2006); *see Thurston Enterprises, Inc. v. Safeguard Bus. Sys., Inc.*, 435 P.3d 489, 500 (Idaho 2019). At the summary judgment stage, the plaintiff must present sufficient evidence to raise a material issue of fact as to each element. *Country Cove Dev., Inc.*, 150 P.3d at 293.

"Omission of information may constitute fraud when a duty to disclose exists." *Humphries v. Becker*, 366 P.3d 1088, 1096 (Idaho 2016). A party may be under a duty to disclose: (1) if there is a fiduciary or other similar relationship of trust and confidence between the two parties; (2) to prevent a partial statement of the facts from being misleading; or (3) if a fact known by one contracting party and not the other is so vital that if the mistake were mutual the contract would be voidable, and the party knowing the fact also knows the other party is unaware of it. *Id.* With respect to fraud, the court determines as a matter of law whether the facts asserted would give rise to a duty to disclose. *Id.*; *see also Knudsen v. J.R. Simplot Co.*, 483 P.3d 313, 325 (Idaho 2021) (same).

In this case, Craig neither alleges nor argues Defendants had a duty to disclose to him they intended to keep his nonrefundable earnest money if he failed to close on the purchase of the Midvale Ranch. Further, the Court declines to conclude Defendants had such duty because the evidence does not support that Defendants' intended to keep the earnest money even if Craig failed to close. For example, as Craig acknowledges, Baker testified the Buermanns always intended to

return at least a portion of the earnest money. (Dkt. 60-7 at Tr. p. 278, ll. 21-25, Tr. p. 279, l. 1

("Q. [Was there] a qualification on how and when you would return the money? A. The contract

says 'nonrefundable.' And it was always our intention to be gracious enough to help him out and

return a portion of it.")). Neither Baker nor Buermann testified they intended to keep the earnest

money if no closing occurred. Absent evidence Defendants intended at the time the parties entered

into Addendum No. 4 to keep the nonrefundable earnest money even if no closing occurred, Craig

has failed to establish Defendants omitted a material fact. Accordingly, the Court grants

Defendants' summary judgment motion on Craig's claim of fraud in the inducement.

**E.     Violation of the Idaho Consumer Protection Act**

Defendants also challenge Craig's claim under the ICPA. "The ICPA prohibits unfair

methods of competition and unfair or deceptive acts or practices in the conduct of trade or

commerce within the State of Idaho." *Pickering v. Sanchez*, 544 P.3d 135, 142 (Idaho 2024)

(internal quotations omitted). The ICPA provides, in relevant part, that it is unlawful to engage in

"any unconscionable method, act or practice in the conduct of trade or commerce." I.C. § 48-

603(18). In turn, § 48-603C(2) enumerates the factors the court must consider in determining

whether a method, act, or practice is unconscionable. Those factors include "[w]hether the alleged

violator knowingly or with reason to know, induced the consumer to enter into a transaction that

was excessively one-sided in favor of the alleged violator" and "[w]hether the sales conduct or

pattern of sales conduct would outrage or offend the public conscience, as determined by the

court." I.C. § 48-603C(2)(c), (d). The Idaho Supreme Court has concluded real property "is clearly

within the [ICPA's] definition of 'goods.'" *Fenn v. Noah*, 133 P.3d 1240, 1245 (Idaho 2006); *see*

*also* I.C. § 48-602(6) (defining goods to include real property). "A consumer who purchase goods

and suffers a loss as a result of an act unlawful under the ICPA may treat the agreement as voidable or seek damages." *Fenn*, 133 P.3d at 1245.

To establish a claim under the ICPA, a consumer must establish three elements: "(1) the consumer purchased goods or services from a seller; (2) the seller engaged in unfair or deceptive act(s) or practice(s) that are declared unlawful under the ICPA; and (3) the unfair act(s) or practice(s) caused the consumer to suffer an 'ascertainable loss of money or property' (real or personal)." *Litster Frost Inj. Laws., PLLC v. Idaho Inj. L. Grp., PLLC*, 518 P.3d 1, 11 (Idaho 2022) (quoting I.C. § 48-608(1)), *as amended* (Sept. 2, 2022), *reh'g denied* (Oct. 14, 2022). Additionally, a consumer must show "the offending party [is] a person who 'knows, or in the exercise of due care should know, that he has in the past, or is' committing an act or practice declared unlawful" under § 48-603. *Pickering*, 544 P.3d at 142 (quoting I.C. § 48-603).

As a preliminary matter, Defendants contend the ICPA does not apply in this case because the ICPA does not apply to the sale of the Buermanns' residence. (Dkt. 60-1 at pp. 34-35). In support, Defendants cited *White v. Mock*, 104 P.3d 356, 364-65 (Idaho 2004). In that case, the plaintiff purchased multi-unit properties from the defendants; subsequently discovered a termite problem, water damage, and mold in units; and sued the defendant for violating the ICPA. *Id.* at 359. The defendants argued the ICPA did "not apply to individuals who are not in the business of selling real property." *Id.* at 364. Rejecting this argument, the Idaho Supreme Court held the ICPA applies to the sale of investment property but not to the sale of one's residence. *Id.* at 365; *see also Fenn*, 133 P.3d at 1244 (applying ICPA in context of land sale contract).

In response to Defendants' assertion that the ICPA did not apply to the sale of their residence, Craig asserts the Midvale Ranch "is an investment property rather than merely a residential home." (Dkt. 69 at p. 22). Defendants do not dispute that Craig intended to use the

Midvale Ranch as a ranching operation for profit, and in fact, they describe the Midvale Ranch as "a residential building and a ranching operation." (Dkt. 60-1 at p. 1). Construing the ICPA liberally, the Court concludes the ICPA applies to the sale of the Midvale Ranch. *See Fenn,* 133 P.3d at 1245 ("The ICPA should be construed liberally").

Under the ICPA, Craig asserts Defendants' conduct was unconscionable because the transaction involved a large amount of nonrefundable earnest money without Defendants having a repayment obligation and, thus, was "undeniably one-sided" and because the "transaction and its aftermath . . . should outrage and offend the public conscience." (Dkt. 69 at pp. 23-24). *See* I.C. § 48-603C(2)(c) (regarding one-sided transaction), (d) (regarding conduct outraging or offending public conscience). Craig, however, has failed to show Defendants knew, or in the exercise of due care should have known, they were "[e]ngaging in any unconscionable method, act, or practice." I.C. § 48-603(18); *see Pickering*, 544 P.3d at 144.

As discussed above, the evidence shows the parties believed the sale would close; Defendants intended to return at least a portion of the earnest money; and Defendants would not have used Craig's earnest money to purchase the Sweet property if they had known Craig was not going to close on the Midvale Ranch. (*See, e.g.*, Dkt. 60-4 at p. 61; Dkt. 60-5 at pp. 32-33, 37, 63; Dkt. 60-7 at pp. 15, 40, 49, Dkt. 60-8 at ¶ 35). Based on this evidence, Craig's failure to close on the sale does not render Defendants' conduct knowingly unconscionable where Defendants were prepared to proceed with the sale otherwise. *See Tricore Invs.*, LLC, 485 P.3d at 114 (affirming conduct violated ICPA where defendant misled plaintiff about closing of sale when defendant knew sale was not going to close). Accordingly, the Court grants Defendants' summary judgment motion on Craig's ICPA claim.

**F.    Declaratory Judgment**

Defendants move for summary judgment on Craig's request for declaratory relief that the Purchase Agreement and its amendments are ambiguous; the parties were mutually mistaken regarding the earnest money; and they entered into an oral agreement for the return of the earnest money.[10] (Dkt. 60-1 at pp. 25-31). Declaratory relief is a remedy, not an independent cause of action. Section 2201 of Title 28 of the United States Code provides that "in a case of actual controversy . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Because the Court concludes Craig's mutual mistake claim fails, it grants Defendants summary judgment on Craig's request for declaratory relief on this issue. Further, because the Court concludes material factual issues exist for trial regarding whether the parties entered into and Defendants breached an oral agreement to return the earnest money, the Court grants Defendants' summary judgment motion on Craig's request for declaratory relief on this issue because a jury, not the Court, must resolve the issue. "[W]hen issues of fact triable by a jury under the common law . . . arise in declaratory proceedings, the procedure must be such as to preserve the right of trial by jury." *Temperance Ins. Ex. v. Carver*, 365 P.2d 824, 827-28 (Idaho 1961); *see also Century Surety Co. v. Saidian*, No. CV-12-7428, 2016 WL 6440140 at *12 (C.D. Cal. Mar. 16, 2016) (applying state law and preserving defendant's right to jury's determination of factual issues even if that determination ultimately affects plaintiff's declaratory relief action).

---

[10]    Craig identified other issues for declaratory relief but does not oppose Defendants' summary judgment motion on his request for declaratory relief based on an alleged illusory contract, failure of mutual consideration, or an unenforceable penalty or forfeiture. (Dkt. 69 at p. 15 n.9). Accordingly, the Court grants Defendants summary judgment on these issues.

The only remaining issue for which Craig seeks declaratory relief is "[w]hether the Purchase Agreement and its written amendments are ambiguous." (Dkt. 54 at ¶ 71(a)). Whether a contract contains an ambiguous term is a question of law. *Knipe Land Co. v. Robertson*, 259 P.3d 595, 601 (Idaho 2011). When interpreting a contract, the Court starts with the document's language. *Id.* at 600. "In the absence of ambiguity, the document must be construed in its plain, ordinary and proper sense, according to the meaning derived from the plain wording of the instrument." *C & G, Inc. v. Rule*, 25 P.3d 76, 78 (Idaho 2001). In assessing whether an ambiguity exists, the Court must determine whether the contract is reasonably subject to conflicting interpretations. *Nelsen v. Nelsen*, 508 P.3d 301, 333 (Idaho 2022). "[A] party's subjective intent is immaterial to the interpretation of a contract." *River Range, LLC v. Citadel Storage, LLC*, 462 P.3d 120, 127 (Idaho 2020) (quotation marks omitted). "Instead, courts will give full force and effect to the words of the contract without regard to what the parties of the contract thought it meant or what they actually intended it to mean." *Id.* (quotation marks omitted).

Two types of ambiguities exist: patent and latent. *Porcello v. Est. of Porcello*, 470 P.3d 1221, 1232 (Idaho 2020). A patent ambiguity exists on the face of the document while a latent ambiguity emerges when the contract becomes ambiguous as applied to the existing facts. *Id.* If an ambiguity exists, interpretation of that ambiguity is a question of fact. *Knipe Land Co.*, 259 P.3d at 601. "[A] latent ambiguity in a contract must ultimately be tied to the language of the instrument itself. Latent ambiguities by nature only emerge when the *instrument* is applied to the facts as they exist." *Porcello*, 470 P.3d at 1233.

Craig argues the Purchase Agreement and its amendments "contain latent ambiguities requiring interpretation." (Dkt. 69 at p. 27). Craig focuses on the language of Addendum No. 4 that states Craig's additional $682,000 in earnest money is both "non-refundable" and "to be

credited . . . at closing." (Dkt. 69 at p. 28; *see* Dkt. 60-17 at p. 2). In full, the provision in question provides: "[Craig] to increase [earnest money] by $682,000. [Earnest money] to be deposited at [the title company] and then released to [Defendants] as non-refundable [earnest money] on or before August 16, 2019. All [earnest money] deposited by [Craig] to be credited to [Craig] at closing towards purchase." (Dkt. 60-17 at p. 2).

Craig argues the "plain meaning of the word 'non-refundable' is called into question by the phrase making clear that [he] was to receive the value of his earnest money at closing." (Dkt. 69 at p. 28). In response, Defendants contend the agreements are clear and unambiguous, and "the earnest money was handled exactly as [Craig] had agreed." (Dkt. 60-1 at p. 27; Dkt. 74 at p. 10). Defendants argue no latent ambiguity exists because if Craig had closed on the ranch, he would have received credit for his earnest money, but because he did not close on the ranch, the earnest money was nonrefundable. (Dkt. 60-1 at p. 27).

When viewed as a whole, the Court finds only one reasonable interpretation of Addendum No. 4: Craig's earnest money was nonrefundable, but if Craig closed on the purchase, he would receive credit for the earnest money. Because Craig did not close on the purchase, Addendum No. 4 unambiguously provides the earnest money is nonrefundable. *Cf. River Range*, 462 P.3d at 127 (concluding "there is only one reasonable interpretation" of the word "nonrefundable"). In other words, if Craig failed to close on the purchase, the earnest money was nonrefundable. Indeed, as Craig's own argument implicitly acknowledges, Craig "was to receive the *value* of his earnest money *at closing*." (Dkt. 69 at p. 28) (emphasis added). No closing occurred, and under the plain meaning of Addendum No. 4, Craig did not receive the value of his earnest money. Relatedly, in relying on a provision about credit for value at closing, Craig fails to identify any provision or language reasonably interpreted as providing the earnest money would be returned if the sale did

not close. *See Porcello*, 470 P.3d at 1232 (requiring latent ambiguity be tethered to specific provision). Craig's failure to root this alleged latent ambiguity in the provisions of the agreement is fatal to his argument. *Id.*

The Court cannot overlook Addendum No. 4's plain meaning, and despite the appreciable amount of earnest money, the Court lacks the power under this theory of recovery to now rewrite the agreement to make it more equitable. *See Nelsen*, 508 P.3d at 334; *Shawver v. Huckleberry Ests., L.L.C.*, 93 P.3d 685, 693 (Idaho 2004); *Doyle v. Ortega*, 872 P.2d 721, 724-25 (Idaho 1994). Therefore, the Court grants Defendants summary judgment on Craig's request for a declaratory judgment that the Purchase Agreement and its amendments are ambiguous.

## IV.  ORDER

**IT IS ORDERED:**

1.      Defendants' Motion for Summary Judgment (Dkt. 60) is **GRANTED IN PART** and **DENIED IN PART**. The Court grants Defendants' motion on Plaintiff's claims for breach of purchase agreement, mutual mistake, unjust enrichment, fraud in the inducement, violation of the ICPA, and declaratory judgment. The Court denies Defendants' motion on Plaintiff's claim that the parties entered into an oral agreement for the return of the earnest money.

DATED: August 21, 2024

Amanda K. Brailsford
U.S. District Court Judge